321-0482 and Granby State of Louis M. Kayser received, and speaker, a panel by Andrew Gash versus Crystal Kayser, M.D., by David Angus. Thank you. Mr. Angus? Oh, I'm sorry. We have to switch the plaques, though. Would you like to start? Sorry about that. Good afternoon. If you may, please come to the podium. The issue here is whether the court abuses discretion in denying my client's request to reopen Maricopa State. I like to think of abuse of discretion in a much more common term of, no other judge would have done it if this judge would have done it under the circumstances. I would argue that there is a threshold issue that we have to kind of weed through, and I noted in my brief in my reply, which is to split authority between the 2nd and the 1st District. We have a much more difficult standard under the 2nd. We have a much easier standard under the 1st, would be my argument. I'm unable to locate, as I noted in my brief, any case law or any directive from this district that has fully defined what we do in situations when the parties enter into an agreement and then under the umbrella of a 1301, one of the parties wants to get out of it for whatever particular reason. I would argue that it is more realistic and maybe more appropriate to adopt the standard set in the 1st District because oftentimes people enter into agreements for a variety of reasons, and those are cost reasons, for example. Like in this case, we have a matter where the parties engaged in very limited discovery, depending on the record and what people have done. And sometimes in that haste to get it over at the lowest dollar possible, sometimes something gets left out. Sometimes there's a cat or there's a piece of furniture or something in that issue that isn't addressed in the settlement. And then under the umbrella of 1301, we want to correct that issue. I think it makes sense to adopt that versus taking a much stricter standard set out in the 2nd District, which is akin to 1401, which can be very difficult, especially in cases where the parties are working with limited income, which is common in that kind of a basis. Assuming that we look at the Draper standard as the proper approach, I think it is appropriate here to reopen the real estate. Now, I acknowledge there is a key fact here that needs to be talked about, which is that in one of the disclosures that was surfed out during the Tennessee case, it does list the policy. No question about that. And those, without being too provocative, I would say that these financial affidavits are sworn to. That's absolutely accurate. It says there that speaking as someone that used to do quite a bit of family law, you're going to be hard-pressed to find somebody that's going to get a disclosure statement accurate 100% of the time. After that disclosure statement was tendered, or it was presumably tendered, because the record doesn't indicate how it was served, but it does have it in the file, there was a subsequent pre-trial memorandum form. Now, these pre-trial memorandum forms, as we look at them, these were prepared by the attorney, the person overseeing the case, and it was done subsequently. It's also signed under the Rock Island County Local Rules as being truly accurate by, in this case, the late Mr. Kaiser. And I would argue that in circumstances where the most recent information is being tendered under a sworn statement is being used for purposes of resolving a matter, it is appropriate to reopen an estate when later on it turns out that, well, it wasn't exactly very accurate. What makes this case, I think, a little bit unique is that whether it was a misunderstanding about what is or what isn't marital property, or whether it was some deliberate malfeasance, we do know, and I believe it is conceded in the apolibri that the policy of the beneficiary was changed during the pendency of the dissolution, which would suggest that there was at least some effort to prevent my client to be the beneficiary of that particular policy. So when we look at the issue of substantial justice, I understand that in terms of due diligence, we do have it affidavit, but we also have to consider other factors as well, which is, you know, we look at the hardship that's going to be created. And in this case, when we look at the assets, and again, we didn't have a trial whether it was a termination of value. We did have at least the parties' position statements as to what these values were. The life insurance fund here, around $40,000 to $41,000, was the largest liquid asset that this small state had. And so when you say that it was a liquid asset, I could not find any record of the cash value. Is this a term policy? Is this a holdout policy? It appears that it was somehow connected to his employment and may have been a benefit of his employment. Is there anywhere in the record where that question is answered, where my question is answered? What was the value of the policy? It would be at least in the 305B order because the policy and the entire amount was placed in counsel's escrow fund pending resolution. I'm not talking about the debt fund, but I'm talking about the value of it prior to the decedent's passing. In terms of the value of it prior to, the only mention of it that you're going to find is limited just to that disclosure statement that was indicated there. I believe it states around $40,000. That's the representation made by the now deceased Mr. Anditch. Mr. Kaiser, I apologize. Apologies to the court. I agree that it says $10,000, but excuse me, $40,000. Was it $40,000 debt benefit or $40,000 in cash value? It doesn't appear there was cash value that the record would suggest. I don't believe so. But in closing my remarks, I think in circumstances such as this, it is appropriate to adopt a more liberal policy towards reopening the states within that 1301 law, with a key asset that normally would be addressed under the statute, under Section 503, could otherwise be addressed at the Magna Carta forward. And so for these reasons, we ask this court to reverse the order of the trial court denying my client's motion to visit. At this point, I turn over to the questions that your Honor is making. One more question. The financial affidavit versus the pretrial memorandum. The financial affidavit is required by statute to be filled out into the exchange between parties. The pretrial memorandum, however, by circuit or even by court, is to reform what the contents are. You talked about the later disclosure, and I agree that if one financial affidavit followed another, that would be a stronger argument. Do you believe that this pretrial memo is akin to a disclosure of some sort? I think it operates in a similar fashion. I don't regularly practice in Rock Island County, but I believe theirs is very similar to Cook's, where it's a particular form with directives under the local rules as to what could be included in there. Key to this pretrial memorandum, which makes, I think, this requirement a little bit unique than maybe other counties, is that in that pretrial memorandum, there is a signature where someone is attesting as to its accuracy. And so I think that is certainly a key factor when we look at the issue of due diligence. Thank you. Good afternoon. May it please the Court, for the record, my name is David Handich. A-H-A-N-D-I-C-H. I'm sorry? And you're alive. And I'm alive, both, yeah. I've had quite a good day so far. I represent the estate of Louis Kaiser, and I represent Crystal Kaiser, who is Louis and Janice's daughter, adult daughter, okay? And both were made parties after Louis's death occurred in this case. If I could start a little out of order and not from my outline, I wanted to answer your two questions, Your Honor. First of all, the cash value was $40,000, and it had the death benefit was $40,000. I misspoke already, Judge. It has no, zero cash value. I want to make sure that's clear, but the real important question was, is it in the record? The value? Yes. Yes, sir. In the pretrial, there was a discussion, that's my other comment I wanted to make, about your questions, Your Honor. There was a discussion about the pretrial memorandum, and that is required. It's a local rule. It's 9-D, if you care to look it up, Judge, under the circuit court rules of the 14th Judicial Circuit, Buck Island White Circuit, et cetera. And the $40,000 value was disclosed in the amended Rule 9-D. That's a financial disclosure affidavit. Those are all requirements of the local rules, and I think the 9-D is probably the requirement statewide. The value of $40,000 was stated, Judge, in the amended financial disclosure. It didn't distinguish whether that was a death benefit or a earned cash value? It did not. You'll see some comments in the record, and the reason I'm kind of, I want to answer this in a proper way. Judge Church has some interesting comments that you're going to see in the record about that, saying specifically, well, it had absolutely no value. We all know that when it comes from an employer, that it's good for one thing. You have to be dead, gone, and you don't really get it. Okay, whoever you name is a beneficiary against itself. You'll see some comments by Judge Church about that also, Your Honor. The local rule, just to be clear and complete, the local Rule 9-D and the local Rule 9-D, those are absolutely requirements of our four-county circuit judge, and I can't tell you how many times I've heard trial court judges say they are not going to try the case when you have a second half merits hearing in a dissolution case. They will not try the case, none of our judges will, without those documents being updated. The 9-D has to be updated, is what we call it, okay? And the 9-D, as in David, if you'll allow me, has to be filed. Otherwise, they will continue the trial. So why is the policy not listed in the general manual? Judge, I think, quite frankly, oversight. I'm trying to be as honest as I can be. I'm one of the lawyers, Judge, so I'm standing here in sort of an unhappy state. There are no excuses, let me start with that, Judge, for it not having been listed, other than the fact that you had three, you know, very busy family lawyers who were trying to do a complete, what have been a, as you'll see from the record, Judge. I've heard of acrimonious divorces and unhappy husbands and wives, Judge. This was right up there, and I'm not saying anything out of school. You can look at the record, Judge, it is ugly, okay? And the lawyers were three very experienced family law attorneys. We've been doing this for decades, all of us, and I know my two opponents very well, in fact, my opposing lawyers. And it was an oversight, Judge, and in the trenches it happens. That's the best I can say. That's not an excuse, and just tell me why it happened. In any event, I wanted to keep my comments somewhat short, maybe especially for me as Justice Day notes, I'm not one of the shorter speakers up here. But I wanted to make sure that the court was clear on the three motions that were pending before Judge Church on September 8th, 21, when we had the oral argument in front of him. It was my motion, or I should call it Lewis Keiser's motion, to correct the judgment dissolution, because the written judgment said that Your Honors had a full picture of this. I got the call that Lewis Keiser was on life support on about this since I had one day to prepare the judgment and whatever else I was doing. And it came as more than a bit of a surprise, and it created a big deal of action and anxiety to try to prepare this judgment and get it correct. There were a lot of rulings that had to go into it. So all of us, all three counsel, two on Janus Keiser's side, we all know of some very small points. And you look at the record and see the minor things that were omitted from the first draft. They are very, very, very small items. So I felt it was incumbent to file a motion. We had agreed on the date when the settlement agreement was read into the record. Ms. Keiser, Janus Keiser, was asked if she agreed to, if there's any dispute or any problem with the written judgment of dissolution, do you agree that she's under oath in testifying? Do you agree that the discrepancy will be resolved by the court and lawyers consulting the written transcript in which the settlement was read in by all of us, by all of the lawyers? So she agreed, Janus Keiser did, on how any dispute, big or small, whatever its size, was going to be resolved. And that's exactly what Judge Church did and bound himself by it. The second motion was Janus Keiser's counsel's motion to debate the judgment entirely. And the third was a procedural, procedural 215, 216, I'm sorry, motion to dismiss the part of my motion to correct the judgment that was based on 5214 of, 1401, excuse me, of the codicillable procedure. And that was eventually granted by the judge. So the judge concluded that the proper interpretation of my motion to correct the judgment was for what he called, and a number of courts called, a motion to correct a new proton. A term we all heard in law school and maybe weren't so sure of its importance until you get out here. And so that's how he interpreted my motion. And at that hearing on those three motions, four witnesses testified, Janus Keiser, Crystal Keiser, and two lawyers who I called as witnesses from Janus Keiser's side. The reason I called them as witnesses, Your Honors, if you look at the original and then the much more voluminous amended motion to vacate the judgment, Janus Keiser's attorney filed, the large bulk of it, 90 plus percent easily, was based on Janus Keiser having been coerced, under duress, and that the agreement was inconstitutable. Well, when we finally got to the oral argument in front of Judge Church, and I had put in my motion to correct all of the testimony of Janus Keiser in response to questioning by our lawyers when this oral settlement agreement was approved by the judge, she said she was delighted with her legal representation. She actually said, quote, very much that she liked her legal counsel. And that she was not. She specifically answered the question. She was under no duress, no coercion, and that the agreement was fair to both of them. So that created a problem, not surprisingly, and I included all of her testimony on that in my motion to correct him in the brief. And so in detail brief I'm talking about. So those were the three motions the judge had before him to decide. He specifically, Judge Church, specifically granted my motion to correct the judgment. He denied the opposing counsel's motion to vacate the judgment, refused to vacate it, and he granted the motion to dismiss to the extent my motion to correct was based on 524201. So that's Judge Church's ruling. It's a three-part ruling that's now in front of this court. Okay? It's a little voluminous and a little complicated, but that's the way it came out. With respect to the standard review issue, I read and studied both opinions from the first and the second district, and I guess I've been at this too long, 49 years at this point, with the abuse of discretion standard that I grew up with. And then I've seen employed by this court hundreds of times in opinions is the one that counsel mentioned that no judge would agree, no person, I'm sorry, no person would agree with the judge's lower court's decision. And that seems to me to be quite a test in order to get a motion to vacate granted. And I believe that's what Judge Church applied. He looked at the situation, he looked at it hard. He's a good student of the law besides being a good judge. And Judge Church, I'm sure, and this court won't be particularly aware, that had Judge Church granted counsel's motion to vacate the judgment, the next thing that would be coming through the door would be a motion to dismiss the entire divorce proceeding. And all of the work that everybody did, the attorneys did a lot of work, despite a few mistakes that occurred. They spent a lot of time in this case, as the docket sheet will confirm. So I'm confident that as you apply whatever statement review you apply, had he vacated the judgment on September 12th, then there would have been a motion to dismiss the entire divorce proceeding. And then Janice Geisler would have claimed her portion as the widow under the Probate Act with a will. She would renounce it, take 50% of the estate. Without a will, she'd get 50% of the estate. So Judge Church had a serious burden and a serious, I don't want to call it a mess, he had a serious problem in front of him that he had to deal with in a very judicious way. We submit he did just that. He relied on a vast body of law that exists, and sometimes when I look at the cases I'm surprised by how many there are, that lower court, trial court judges have tremendous authority to correct a mistake that's been made in the judgment. And there are numerous cases, including divorce judgments by agreement, in which parties try to vacate them or whatever, and the court is bound by the law that I cited, that the only changes that can be made are to correct errors that are supported in some fashion in the record. They can't go outside of that and go on their memory, their recollection or anything like that. I've cited maybe 10 cases in my brief that stand for that proposition. So there's no question Judge Church had overwhelming judicial authority to rely on to grant the motion to correct the judgment when he said, I will allow it to be corrected, to correct every one of these little minor points that got lost in the heat of Mr. Kaiser, my client being on his deathbed. Is that correct? I'm sorry. That is correct, Joe. But I felt that I wanted the court to know the context of what was in front of Judge Church, because you have to, using any standard of review, the first instance or the second, ours that's been stated by Justice McVeigh in the BR or Bergstein case or something, Judge, you talked about the standard, whatever standard we use to determine whether Judge Church abused his discretion, it has to be based on what were the facts in front of Judge Church. And to me, one of those important facts were all the motions that were pending before him and the only motion of the three judges that made any sense, really, given the law, was the motion to correct the judgment. That was consistent with the large body of law that I... His briefings were mentioned. That's what he went on. So I just thought we should do that. It's three very important questions, but that's the issue that we have to decide. So at the time of the agreement, when the judges testified, yes, it wasn't under duress, it was a happy moment, where it was a yes, it was a fair judgment. At that time, the idea was like a policy, and this happens all the time. These policies are common in the practice of merit law, correct? Yes. And then it took over a year to get the judges, for whatever reasons. I put in my great judge, but it took over a year. None of the lawyers would sign the judge. But the bottom line of my point is this. If keeping that law won't get the judgment anger from a legally clear, that doesn't happen. It's very unusual, Judge. So if it had been signed in the normal course of business, within a month, then judges wouldn't have to. That zero policy value would have stuck. Yes. Thank you. You're welcome. I would just like to say now that you've raised the issue of justice, there is an explanation in my brief of why that year took place. I do with honor. Thank you. Thank you. Because I too felt it was a long time. In any event, I believe what Judge Church did not only was not an abuse of discretion. I think what he did was absolutely correct and consistent with the law that supported him. And he was right in what he did. And I ask this court, therefore, to affirm the decision of Judge Church. I'm on a red light, Judge. Justice is so. I think I'm going to shut up. I'm going to stop. But I'll certainly answer any other questions. Just one quick question. Sure. Counsel, I don't think your opponent is raising this, but your client's death, was that by accident or illness? And was that illness, if it wasn't, that was present at the time of the divorce that took place? No, Judge. Judge got sick with a very serious disease, Judge, and expired in a six-month period or so. That's not in the record. I don't think your opponent is even raising that as an issue. No. It seemed to be an underlined tone, so I wanted to address it. That's all I have. Thank you very much. I appreciate everyone's time. Counsel, could you tell us about your name? It's Gotch, Your Honor, but different members of my family say it differently, so I don't know if there is a wrong way to say it. So, Mr. Gotch. Just very briefly, a couple points. In regards to the argument that the court would have to vacate the whole kit and caboodle and unmarry them, I don't think we need to address that issue, because paragraph A of the amendment pleading for the states to vacate all or in part, and so we were just asking to vacate just the Maryland state portion. Obviously, Mr. Kaiser has already passed on, and it would be kind of a very murky area to be asking to undo the whole thing, including the balance of reestablishing the balance of matrimony. So that would not be something that we were trying to present before the And secondly, in regards to just the observation, the brief discussion on the non-quotant, obviously non-quotant is just where something happens where the written order differs from what actually is supposed to be, and what was supposed to be is referenced in the reference somewhere. It can be done now. It can be done three years from now. There's really no limit to that, but I think it goes to show based on counsel's argument that it was kind of a loose strands there, and so that's why I would argue that the Draker standard is the proper standard, especially since sometimes, you know, right after that, we might say, oh, you know, we've got a lot of stuff going on, but now we've had a chance to kind of look at it. Within that three-day time period where the court historically, traditionally still retains jurisdiction over the Maryland state and the parties, that is, I think, the proper standard, and it's a good reason to do that. So that's just the two comments I wanted to make in response to counsel's argument, and I'll turn this over to the court if it has any additional questions. Thank you, Mr. Patrick. Thank you. Thank you, counsel. We thank both of you for your arguments this afternoon. We'll take the matter under advisement and we'll issue a recommendation expected April 25th.